UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| UNITED STATES OF AMERICA | ) | DOCKET NO. |
| --- | --- | --- |
|  | ) | 1:22CR72-02 |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
|  | ) |  |
| 2) DARRIS GIBSON MOODY, | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Darris Gibson Moody appears before the Court for sentencing for making interstate threats to kidnap or injure others in violation of 18 U.S.C. § 875(c). Violations of this statute typically involve a single victim with whom a defendant has a personal grudge, or hate speech directed at a member of a protected class. This case is very different, both in scope and in content. Moody placed dozens of local victims (and co-defendant Dever sponsored over 900 nationally) in reasonable fear that armed, anti-government, conspiracy theorists might invade their homes and "arrest" them for a cash bounty because of the victims' dedication to public service. The Government requests that the Court impose a sentence within the applicable guideline range

because the aggravating circumstances of her case are substantial and her plea agreement sufficiently rewarded her for any mitigating circumstances.

## **The Guideline Range Fails to Fully Account for the Seriousness of the Offense**

The threats contained in the so-called "Writs of Execution" were chilling. They declared that the victims had been "convicted" of felony offenses by a secret "Environmental Court." *See* PSR, Ex. 2 (Doc. #140-2). Using quasi-revolutionary rhetoric, the documents declared the victims to be "enemies of the people" due to "crimes against humanity, war crimes, genocide, and traitorous treason." *Id.* at 3. The pronounced punishment for these "strict liability" crimes was up to 30 years' imprisonment or *death*. *Id.* at 3, 14. Worst of all, they notified the victims that they were subject to "citizens arrest" by anyone willing to collect a $10,000 bounty ($20,000 for attorneys), and that those arrests could be conducted without a warrant within 30 days of receipt of the writ. *Id.* at 2, 3, 14. The Defendant threatened, "You must get your affairs in order and be prepared to plead for mercy before the tribunal." *Id.* at 1.

Page **2** of **18**

Case 1:22-cr-00072-MR-WCM   Document 152   Filed 08/17/23   Page 2 of 18

The writs purported to be sent by a secret, nefarious-sounding organization that audaciously claimed to speak for "the people." The cover letter was emblazoned with an official-looking logo for the "People's Bureau of Investigation," or, "PBI." *Id.* The so-called "Environmental Court" claimed to have a "25-member independent Grand Jury of the people" (of which Moody claimed to be among their number) who convicted the victims without trial or due process. *Id.* at 3. The writs warned that the victims had been targeted by a large group of people and that *anyone* willing to abduct the victims would be rewarded with a sizeable cash bounty.

Any victims who were curious about the PBI could, with a quick online search, find the PBI's website and discover that the organization's true aim was to overthrow the government. *See* PSR, p. 12 (Doc. #148). Even worse, such victims would discover that the PBI had "doxxed" them by posting their names, addresses, telephone numbers, and other personal identifying information, making it easy for those motivated by the bounties to find and "arrest" (kidnap) them. *Id.* at 9–11. Each victim was essentially threatened twice — once upon

personal receipt of the threatening writ, and again when they were publicly identified and publicized by the PBI for arrest.

The victims were threatened by an organization, not just an individual, making the threats more menacing. The defendants' threats were intended to be anonymous as they hid behind the mask of being "of the people." The secretive and crowd-sourced nature of the writ's origin exacerbated the threat. A person targeted by a threat from a *known individual* can take safety precautions such as reporting the assailant to the police or seeking a protection order from the court. One threatened by an *anonymous individual* can take some comfort when law enforcement undertakes to identify and prosecute an unknown perpetrator. But a victim who is targeted by an *anonymous organization* such as the PBI has greater cause to fear — especially when the anonymous organization publicly posts a cash bounty for *anyone* willing to collect. Who might come for them in the middle of the night? And in what numbers? Will the prosecution of Dever and Moody mark the end of the threat, or will the victims continue to fear that others will complete the task despite (or, perhaps, *because of*) the defendants' incarceration?

These threats also required extensive premeditation and deliberation. Unlike many threats that are tantamount to guttural snarls in the darkness, these threats were backed by a well-documented ideology, lengthy treatises, training videos, and soldiers willing to do their commander's bidding. This made the PBI's threats even more ominous. The Defendant didn't simply lose her temper and say something she later regretted in the heat of the moment — her threats were the result of long-term planning, preparation, and training. The Defendant embraced Dever's goal of wiping away our government and acted repeatedly upon it by serving his writs.

A downward variance would be inappropriate due to the unusually menacing nature of the threats. Most victims of this crime are targeted by an individual, but the 57 victims in this case that Moody served were hounded by a secretive, anti-government group whose stated goal is to overthrow the government and remove, arrest, and possibly execute all people currently engaged in public service. The harms caused by initial threats were compounded by doxxing the victims and placing a cash bounty on their heads to encourage *anyone* to collect the reward for kidnapping them. A sentence below the guideline

Page **5** of **18**
Case 1:22-cr-00072-MR-WCM    Document 152    Filed 08/17/23    Page 5 of 18

range would not adequately address the scope of the harm Moody inflicted upon her victims.

## The Guideline Range Does Not Fully Account for the Number of Victims

The sheer number of victims is staggering. Moody, Dever's agent in Western North Carolina, served Dever's threats to at least 57 victims, most of whom were local public servants. *See* Attachment A, sealed Doc. #150, filed as "List of Victims by Name and Position." Many worked in the justice system — judges, sheriffs, and district attorneys. Others were local (and, often, first-time) politicians — county commissioners, aldermen, and mayors. All had their personal information posted on the PBI website and their personal safety threatened.

But Moody was just one of many PBI "agents" issuing these threats at Dever's direction. Dever's PBI website directory of served victims contained over 900 victims' names from approximately 32 different states. Dever's PSR, p. 11 (Doc. #148). Dever ordered his followers to serve every public servant with these threats in order to "abolish our government." *Id.* at 13. Dever published the documents, trained his supporters how to serve them, promised monetary rewards,

and provided the means to post his victims' personal information on his website.

The applicable guideline range does not fully account for the number and nature of the threats. The guideline range includes a 2-level adjustment because the crime involved "more than two threats." U.S.S.G. § 2A6.1(b)(2). Even discounting those threatened nationwide by other PBI "agents," Moody is directly responsible for threatening at least 57 victims. The Sentencing Commission recognized that "offenses covered by this guideline may include a particularly wide range of conduct" and suggested that courts consider departures when an offense involves "multiple victims." U.S.S.G. § 2A6.1(b)(2). Appl. Note 4(A) and (B)(iv). Moody's conduct involved substantially more than what is needed to trigger the 2-level enhancement, so even though the Government is not seeking an upward variance in her case, a downward variance would be unwarranted.

### The Offense Conduct Also Threatened American Democracy and the Rule of Law

Despite cloaking herself in patriotic-sounding rhetoric, the Defendant's vision for a new government was an affront to American democracy. She was not too keen on things like due process, the

presumption of innocence, or the right to an appeal. The "writs" that she served declared that their victims were convicted by a secret grand jury without trial, that they were guilty under a "strict liability" theory of crimes that carry the death penalty, and that their "court" was not subject to appeal. PSR, Ex. 2, pp. 1–3, 9, 14 (Doc. #140-2). If the victims failed to vacate office, sign their acknowledgement forms, and pay $250,000 fines, the PBI would consider their silence to be "consent" under their jurisprudence. *Id.* at 2, 13. Once arrested, the victims could only "plead for mercy before the tribunal." *Id.* at 1. The Defendant claimed to be a patriot, yet she promoted the worst aspects of tyranny.

There were many victims of this crime, including American democracy itself. The direct victims were public servants, most of whom were elected to serve; the indirect victims were all Americans who enjoy the right to vote. The attacks on this class of people were designed, as Dever stated in one of his training videos, to "abolish our government." The writs were a means to that end. The Defendant believed the victims to be "enem[ies] of the people by default" merely because they were "elected official[s]." *Id.*

## **It Was Not About Water Quality**

The Defendant threatened the victims because they were civil servants, not because she hoped her actions would improve water quality. "Convicting" the victims in their sham "environmental court" was a means to removing the government as a whole — it was not about water pollution. The water quality complaints were nothing more than the sovereign-citizen equivalent of taking down Al Capone for tax evasion.

The writs themselves are the best proof that the Defendant was more anti-government than pro-water. The cover letter rants about how the government is really a corporation infiltrated by English nobility (or "BAR agents"). *Id.* In fact, the cover letter barely mentions "water." *Id.* The "Writ of Execution" captions the bogus court case as, "People vs. Fauci et. al.," implying that they take issue with vaccines introduced into "a human body of living water." *Id.* at 2. The language that follows rages against the 5G cellular network, GMOs, glyphosates, and canola oil. *Id.* A victim served with these papers would be hard-pressed to conclude that the PBI's primary concern is water pollution.

Very few of the victims who received the writs had anything to do with the protection of water quality. Among the list of local victims were judges, prosecutors, police officers, school board members, and even some bankers and health care providers. *See* Attachment A, Doc. #150. Dever's online training focused on serving sheriffs, not officials responsible for protecting water quality. Moody chose the 57 victims, including targeting two employees of the Haywood Regional Medical Center because she was vexed that they required her to wear a mask in their facility during the pandemic. *Id.* If local water pollution was the primary issue, why was the U.S. Postmaster General among the victims? *Id.*

The PBI's website clearly demonstrates that the organization's true aim is the elimination of the United States government, not the protection of drinking water. The picture on the "documents" page of Dever's website lists many targets for the PBI's ire, such as the "Biden regime," Congress, the IRS, the FBI, the CIA, the Fed, the RNC, the DNC, MSNBC, CNN, FOX, state capitals, Antarctica, Maricopa, and Area 51. PSR, p. 12 (Doc. #148). All that anger, but nothing having to

do with water. The organization's primary goal was to "throw off [the] Government," not protect drinking water. *Id.*



Dever's PSR, p. 12 (Doc. #148).

The Defendant's rhetoric, preserved in two voicemail messages, indicated that her primary mission was the destruction of government. In August 2022, Moody encountered one of her victims in a testy

exchange at the Haywood County Register of Deeds' office. PSR, pp. 11–12 (Doc. #140). Afterwards, Moody left two voicemail messages for the Register of Deeds (whom Moody knew personally). *Id*.; Attachments B, C.[1] They barely mention water quality. Moody admitted to serving the writs and defended her authority to do so, claiming that she had "higher jurisdiction than our government now." Attachment B. She complained about bar attorneys being servants of the crown who rule us from London, DC, and Italy. Attachments B, C. Moody warned that "the government is our enemy, and you're in it," and, "if you're in the government you're guilty of all their crimes against humanity." Attachment B. She also accused the government of spreading COVID-19 as a "bioweapon." Attachment C. Moody only briefly mentions water quality during the second call, alongside complaints about COVID-19, child trafficking, and bar attorneys. *Id*. Instead, she focused on how "the government is fired" and how she showed mercy on her friend by not serving her with a writ. *Id*. Moody also explained

---

[1] The Government sent the audio files to the Court in advance of the sentencing hearing, referred to herein as Attachment B (nupointvoicemail_404207.wav) and Attachment C (nupointvoicemail_404053.wav). These files have previously been made available in discovery.

that the threats were real and that government officials would be arrested:

> This is very serious because if they do not sign the REO's ["Resolution by an Elected Official," *see* PSR, Ex. 2, p. 9 (Doc. #140-2)] then they will be, once I get the FOIA and the surety bonds, their E-9s, and the insurance on them, you know, and I file a claim, they have a . . . writ of body attachment tied to them . . . .  If you continue to serve in government when the people have fired you or arrested you or served you papers, you're committing more felonies by the day.

*Id*.  Like the writs and the PBI website demonstrated, Moody's primary aim was the forced removal of public servants, not the protection of water quality.

## A Within-Guideline Sentence Is Necessary to Achieve the Statutory Goals for Sentencing

The Government recommends a sentence within the applicable guideline range.  That sentence is sufficient but not greater than necessary to achieve the purposes set forth in 18 U.S.C. § 3553(a).

a. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

These are very serious crimes that directly affected 57 victims and indirectly affected all Americans.  For the reasons previously stated in

this filing, the threats were far more substantial and impactful than is typical for this kind of offense.

Although the Defendant has no prior criminal history, the offense conduct involved months of planning, training, research, writing, and execution. Although Dever was the promoter, Moody selected the victims. She conducted extensive research (which was recovered from her home during the execution of the search warrant) on her chosen targets so that she could post their personal identifying information on the PBI website once served.

> b. <u>The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment</u>

The Defendant's contempt for the law is high. She adopted the PBI's goal of elimination of our system of laws and replacing it with secret courts, strict liability death sentences without due process, and mob justice. She further demonstrated that contempt when she ignored the Court's pretrial release orders (which she later claimed she signed "under duress") and obstructed justice by failing to appear at her arraignment as instructed. PSR, pp. 13, 24 (Doc. #140). She believed that she stood above the law; the Court's judgment should be tailored to

convince her otherwise — or, at least, convince others not to follow in her footsteps.

    c.    <u>The Need for the Sentence to Afford Adequate Deterrence to the Criminal Conduct</u>

The Defendant claimed that she was authorized to threaten to kidnap public officials because she believed her authority to be superior to the rule of law. The law must protect others from those who seek vigilante justice when they disagree with the law or its authority over them.

General deterrence is also important. The PBI's many followers need to see that such actions have significant consequences.

    d.    <u>A Guideline Range Sentence is Necessary and Appropriate</u>

The Defendant's current guideline range is 30–37 months' imprisonment. A sentence within the applicable guideline range is necessary and appropriate.

Several factors warrant an upward departure or variance. As previously discussed, the nature of the threats at issue is more severe than the heartland case and affected *many* more victims. Comparisons of threat severity are difficult to make using the guidelines, but accounting for the number of victims is easier. The

guidelines assess a 2-level enhancement because the crime involved "more than two threats." U.S.S.G. § 2A6.1(b)(2)(A). Moody threatened 57 victims. The guideline range listed in the PSR could be achieved by one who threatened just three victims. Recognizing this, the Sentencing Commission suggests that upward departures should be considered for offenses that involve "multiple victims." U.S.S.G. § 2A6.1(b)(2). Appl. Note 4(A) and (B)(iv). "Multiple victims" is an understatement here. At the time of this filing, the Government only has a preview of the Defendant's case for a downward variance; but the mitigating factors likely are insufficient to require a downward variance when considering the aggravating circumstances of this case.

The Defendant already has reaped substantial benefits from her guilty plea. First, she avoided grouping unit increases that could have added another five levels to her range (and could have called for an upward variance since that enhancement caps at five levels despite the excessive number of victims). U.S.S.G. § 3D1.4. Second, the current range is extremely generous when compared to her guideline range for conspiracy to commit kidnapping (Count 63). The offense conduct set forth in the PSR establishes that Moody conspired with Dever and

others and placed $10,000–20,000 bounties on the heads of public servants understanding that Dever's instructions were to have them arrested in their homes. The plan was to arrest hundreds of government workers, and the conspirators committed hundreds of overt acts in furtherance of that goal. Moody's voicemail messages indicate she fully understood the purpose of her writs and their effects on her victims. Her guideline range for a guilty plea to Count 63 would be 210–262 months.[2] Her post-plea, guideline sentence remains substantially less than what she could be facing for her conduct. A downward variance would be difficult to justify when considering what her guideline range could be without a favorable plea agreement.

## Conclusion

For the reasons set forth herein, the Government requests that the Court sentence the Defendant to a period of imprisonment within the applicable guideline range.

RESPECTFULLY SUBMITTED, this the 17th day of August, 2023.

---

[2] Base offense level 32 (§2A4.1(a)), plus 6 levels for "official victim" and 2 levels for "obstruction of justice" (§ 3A1.2 and § 3C1.1), minus 3 levels for acceptance of responsibility (§ 3E1.1). This range is achieved by conspiring to kidnap *just one person*.

DENA J. KING
UNITED STATES ATTORNEY


/s/ Don Gast
_____

DON GAST
ASSISTANT UNITED STATES ATTORNEY
N.C. Bar Number: 23801
100 Otis Street, Suite 233
Asheville, NC 28801
Telephone: (828) 271-4661
Facsimile: (828) 271-4670
Don.Gast@usdoj.gov

/s/ DAVID A. THORNELOE
ASSISTANT UNITED STATES ATTORNEY
N.C. Bar number: 54463
100 Otis Street, Suite 233
Asheville, NC 28801
Telephone: (828) 271-4661
david.thorneloe@usdoj.gov